IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEVERLY RIVERA | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  23-454 |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA OFFICE OF THE | : | |
| ATTORNEY GENERAL | : | |

## MEMORANDUM

MURPHY, J.                                                          November 13, 2024

### I.    Introduction

Beverly Rivera is a Puerto Rican woman and a former Narcotics Agent who was

employed by the Bureau of Narcotics Investigations in the Pennsylvania Office of the Attorney

General (OAG).  She claims that she was terminated because of her race and sex and that the

OAG created, condoned, and perpetuated a hostile work environment based on the same.  This

opinion addresses the OAG's motion for summary judgment.

The OAG argues that Ms. Rivera did not face a hostile work environment and that her

termination was due to her poor work performance.  The OAG points to largely unrebutted

evidence that Ms. Rivera struggled in her position as a Narcotics Agent, failed to meet job

expectations, and consistently underperformed.  This evidence includes a negative performance

review, documentary evidence of issues with firearm handling, specific examples of problematic

report writing, and issues with her undercover investigations.  Discovery offered little to

contradict the OAG's narrative, especially because in Ms. Rivera's deposition, she could not

recall most of the bases for her lawsuit.  But in opposition to summary judgment, Ms. Rivera

proffered a declaration in which she recalled a variety of information.

On close review of the record evidence and arguments advanced by the parties, and even

accepting Ms. Rivera's dubious declaration, we find that no reasonable jury could sustain any of Ms. Rivera's causes of action. We grant the OAG's motion for summary judgment.

## II.    Background

Ms. Rivera began her employment with the OAG as a Narcotics Agent I in August 2019. DI 23 ¶ 1. She was placed on administrative leave on March 31, 2021, for purported policy violations, *id.* ¶¶ 21-23, and was terminated on August 30, 2022, DI 7 ¶ 27. Approximately six months after she was placed on administrative leave but before her termination, Ms. Rivera made a complaint of discrimination to the OAG related to Agent Martinez. DI 23 ¶ 36. Ms. Rivera later filed this lawsuit alleging that she was subjected to a hostile work environment and that her termination was due to sex and race discrimination. We detail the relevant factual background below.

### A.  Ms. Rivera's job performance.

From August 2019 to August 2020, Ms. Rivera's performance was rated as satisfactory or commendable in all ratings categories. DI 29-2 ¶ 2. However, this performance rating did not last. From August 2020 through August 2021, Ms. Rivera's overall performance was rated as unsatisfactory, with a number of individual categories being rated as "needs improvement," including job knowledge skills, professional development, work results, communication, interpersonal relationships, and work habits. DI 23 ¶ 5; DI 29-2 ¶ 5.[1] Ms. Rivera was placed on administrative leave on March 31, 2021, for violations of the OAG Criminal Law Division

---

[1] Ms. Rivera does not dispute what her performance evaluation stated, but she denies the underlying fact that her work performance was problematic. DI 29-2 ¶ 5.

Criminal Investigations Operational Manual ("OAG Manual") that occurred between October 2020 and March 2021.  DI 7 ¶¶ 9-10.  Ms. Rivera was eventually terminated on August 30, 2022.  *Id.* ¶ 27.

Before Ms. Rivera's termination, the OAG found her in violation of several OAG Manual Directives, including 204.4 (Performance of Duty), 204.5 (Competency), 204.14 (Reporting for Duty), and 204.23 (Reports).  DI 23 ¶ 32; DI 29-2 ¶ 32.[2]  The OAG identified various problems with Ms. Rivera's reporting, including Ms. Rivera reportedly "authori[ing] two discoverable reports, identifying the authors of the reports as Agent Kanyuck and Agent Kamara, respectively, instead of herself," lack of timeliness, and providing materials "riddled with errors and unclear references."  DI 23 ¶¶ 10-14; DI 29-2 ¶¶ 10-14.  During her deposition, Ms. Rivera did not recall these issues, DI 23-1 at 47-66, though she now purports to recall certain topics in her declaration, DI 29-3.  Her declaration asserts that Agents Kanyuck and Kamara knew that she prepared reports with their names, and she now recalls that other agents had problems with report writing but were not disciplined like she was.  DI 29-3 ¶¶ 4-5.

The OAG also assessed Ms. Rivera to be deficient with firearms, describing her as "strugg[ling] with even the fundamentals of firearms," failing to follow instructions, and "not hitting anywhere on the target."  DI 23-4 at 1-2.  Ms. Rivera admitted that the OAG made this assessment of her, but noted that she "passed both day and night qualification, and her firearm was not taken from her."  DI 29-2 ¶¶ 7-8.  Finally, the OAG found Ms. Rivera's undercover work to be problematic.  DI 23 ¶ 18.  In short, it was determined that Ms. Rivera endangered the

---

[2] We note that the termination letter also includes a finding that Ms. Rivera violated OAG Manual Directive 204.8 (Lawful Order).  DI 23-2 at 1.

lives of other officers by failing to respond to messages and breaking her cover. *Id.* Ms. Rivera did not dispute this assessment but countered with testimony that she "had a reputation as a good undercover agent" in the past. DI 29-2 ¶ 18.

The Operational Professional Responsibility Unit ("OPR") was alerted to the concerns with Ms. Rivera's performance and launched an investigation into her compliance with OAG policies, at which time she was placed on administrative leave. DI 23 ¶¶ 21-23; DI 29-2 ¶¶ 21-23. Following interviews and a pre-disciplinary meeting, the OPR found Ms. Rivera to be in violation of several directives, as discussed above, and "sustain[ed] the allegations levied against her by OAG." DI 23 ¶ 28; DI 29-2 ¶ 28. Following the OPR investigation, Human Resources ("HR") launched its own investigation. DI 23 ¶ 30; DI 29-2 ¶ 30. HR considered all the evidence and found Ms. Rivera to be in violation of a number of OAG directives, "sustaining the allegations levied against her by OAG." DI 23 ¶ 32; DI 29-2 ¶ 32. The OAG's HR representative concluded that Ms. Rivera lacked "the required skill and/or ability to be a Narcotics Agent at this time," and Ms. Rivera was terminated. DI 23 ¶ 33; DI 29-2 ¶ 33.

**B. Ms. Rivera's allegations of race and sex discrimination.**

After six months on administrative leave but before her termination, Ms. Rivera first raised claims of discrimination with the OAG. DI 23 ¶¶ 35-36; DI 29-2 ¶¶ 35-36; *see also* DI 23-14. Her claims to the OAG share the same factual bases as the hostile work environment claim before us. *See generally* DI 7; DI 23-14. In short, Ms. Rivera reported that Agent Martinez was discriminating against her based on her race and sex. DI 7 ¶ 12; DI 23-14 at 1. This included Agent Martinez being "unapproachable," "act[ing] as if Agent Rivera's mere presence was bothersome," making "inappropriate remarks," and "discuss[ing] Agent Rivera

4

with her co-workers in a derogatory and demeaning manner." DI 7 ¶ 12; *see also* DI 23-14 at 1. Most notably, Ms. Rivera claims she was told that Agent Martinez inquired into whether Ms. Rivera and Agent Rucker were dating, and that Agent Martinez said to Agent Rucker "look at Louie [Melendez] trying to fuck Beverly [Rivera]." DI 7 ¶ 13; DI 23-14 at 1. Ms. Rivera purportedly had numerous conversations with Agent Rucker about how Agent Martinez made her feel uncomfortable and told Agent Rucker that she wanted to transfer to a different squad to get away from Agent Martinez. DI 7 ¶ 14; DI 23-14 at 1.

Ms. Rivera also told the OAG that Agent Martinez prevented her "from working with other Narcotics Agents" and "blamed Agent Rivera for poor performance by others," DI 7 ¶¶ 15-16; s*ee also* DI 23-14 at 1-2. Ms. Rivera alleged that Agent Martinez removed her from an investigation with Officer Melendez, despite the two wanting to work together. DI 7 ¶ 17. Officer Melendez testified that Agent Martinez said, "something to the effect of I was moving too fast and Beverly [Rivera] couldn't keep up," and that he disagreed with Agent Martinez's decision. DI 23-15 at 21-22. Ms. Rivera apparently shared her frustrations with Agent Richard Lynch. DI 7 ¶¶ 15-16; DI 23-14 at 1-2.

Finally, Ms. Rivera alleged that Agent Martinez used harsh language with her in an "off the record" meeting about her performance. DI 7 ¶ 18; DI 23-14 at 2. This included the phrasing "You fucked up. And you have to admit when you fuck up. I am an old man and I admit when I fuck up." DI 7 ¶ 18; DI 23-14 at 2-3. At her deposition, Ms. Rivera testified that she could not recall the meeting in January where she was "told [her] performance was poor." DI

23-1 at 62-63.[3]

## C. The OAG's anti-discrimination policy and reporting procedures.

The OAG has a policy prohibiting discrimination and harassment, as well as reporting procedures for any instances of discrimination or harassment.  DI 23 ¶ 42; DI 29-2 ¶ 42.  Under the OAG's policy, "an employee experiencing discrimination/harassment is directed to report it to a Division Director and to the Director of Human Resources," after which "an investigation ensues."  DI 23 ¶¶ 43-44; DI 29-2 ¶¶ 43-44.  Ms. Rivera acknowledged receipt of this OAG policy in 2019, 2020, and 2021.  DI 23 ¶ 47; DI 29-2 ¶ 47; *see also* DI 23-19.  However, she did not "take advantage of the reporting policies…during her employment with OAG as a Narcotics Agent," and testified at her deposition that she did not know a policy was available to her.  DI 23

---

[3] The OAG disputes Ms. Rivera's characterization of the events.  First, the OAG pointed out that "Agent Rucker specifically denied that Martinez asked her if she and Plaintiff were dating or that Martinez ever said, 'Look at Louie trying to fuck Beverly,' and specifically denied that she told Plaintiff same" and that "Supervisor Martinez specifically denied that he ever asked Rucker if she and Plaintiff were dating or that he never said to Rucker, 'Look at Louie trying to fuck Beverly.'"  DI 23 ¶ 37.a.ii.-iii.  Ms. Rivera argues that Agent Rucker and Agent Martinez's "denial(s) create[] a genuine issue of material fact precluding the [c]ourt from granting summary judgment in favor of the defendant."  DI 29-2 ¶ 37.a.ii.-iii.

Second, the OAG notes "Nehemiah Haigler testified that he recalled the January 2021 meeting; however, testified that Martinez did not use profanity; rather, Martinez and Haigler addressed issues with Plaintiff's work product" and "John Martinez testified that he also recalled the January 2021 meeting; however, also testified that he did not use profanity; rather, Martinez and Haigler addressed issues with Plaintiff's work product."  DI 23 ¶ 37.d.ii.-iii.  Ms. Rivera argues that Chief Haigler and Agent Martinez's "denial(s) create[] a genuine issue of material fact precluding the [c]ourt from granting summary judgment in favor of the defendant."  DI 29-2 ¶ 37.d.ii.-iii.

We accept Ms. Rivera's version of the facts for summary judgment.  *Anderson*, 477 U.S. at 255 (1986) ("The evidence of the nonmovant is to be believed.").  We may find that summary judgment for the OAG is appropriate under those facts and set aside disputed facts if they are immaterial.  *Id.* at 248. ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

¶¶ 46-47; DI 29-2 ¶¶ 46-47.

### D. Ms. Rivera's disputed declaration.

Ms. Rivera attached a personal declaration as evidence in support of her opposition to summary judgment. DI 29-3. Her declaration largely conflicts with her deposition testimony, during which she answered that could not recall a significant portion of the facts alleged in her complaint. At her deposition, Ms. Rivera responded to questions stating "I don't recall" as early as the introductory questions unrelated to her job performance and allegations of discrimination. DI 23-1 at 12-13. She then continued providing the same answer of "I don't recall" for questions about both her employment performance and the factual underpinnings of her discrimination claims. *See generally* DI 23-1.

For example, when asked about her employment with the OAG, Ms. Rivera did not recall her salary, the job qualifications, a range of how many other agents there were, any of her job duties, or the type of work she was doing. *Id.* at 34-38. She did not recall whether she had performance reviews, the specific performance reviews at issue in the case, her remedial firearms training or writing training, or receiving "any negative feedback" while employed as a Narcotics Agent, among other topics. *Id.* at 43-60. This pattern of not recalling nearly any information about her job performance, the subsequent investigation, and her termination continued throughout the deposition. *Id.* at 60-72, 78-96.[4]

Ms. Rivera also largely did not recall the factual bases for her discrimination allegations

---

[4] One instance that Ms. Rivera did recall was a time she was at an undercover job and "spoke with a homeless man whom [her] grandmother used to feed," though she did not recall being reprimanded about the incident. DI 23-1 at 73-77.

during her deposition.  *Id.* at 96-109.[5]  At one point, Ms. Rivera stated "I cannot definitely tell

you if I could remember more due to my high stress."  *Id.* at 107.[6]  Then, over two months after

her deposition, Ms. Rivera filed a declaration — to support her opposition to summary judgment

— in which she remembers much of what she could not earlier recall.  She stated:

> "During my deposition I was stressed and overwhelmed to the point that I broke down in
> tears.  The stress impeded my ability to concentrate.  Being questioned by defendant's
> attorney about the events related to my employment caused me to suffer from a great deal
> of trauma and grief.  My experiences during my employment have caused me such stress
> that I am in therapy."

DI 29-3 ¶ 2.  The remainder of Ms. Rivera's declaration includes statements relating to topics

that she struggled to recall during her deposition, including that she:

- "was never made aware of any serious problems with [her] shooting."  *Id.* ¶ 3
- "successfully completed the [firearms] course and was able to retain [her] firearm.
  *Id.*
- "prepared the CLD Investigative Reports for the execution of search warrants…with
  the full knowledge of Messrs[,] Kanyuck[,] and Kamara."  *Id.* ¶ 4.
- "prepared CLD Investigative Reports according to the training [she] received…[and]
  [t]o the extent that supervision identified any issues with [her] report preparation,
  [she] was not the only Agent who exhibited such issues…"  *Id.* ¶ 5.
- was assigned to take a virtual writing class with "Sidiqi, Kamara, Richard Lynch,
  Adam Schurr, and others…to assist us in preparing investigative reports and
  affidavits of probable cause."  *Id.*
- "took a virtual report writing class."  *Id.* ¶ 7.
- was not aware of any "hard and fast rule concerning the format reports are required to
  follow."  *Id.* ¶ 5.

Ms. Rivera signed the declaration certifying that her statements were true and correct

---

[5] Ms. Rivera did recall Agent Rucker telling her about a conversation in which Agent
Martinez said "Look at Louie [Melendez] trying to…fuck Beverly" but did not recall any details
about the conversation.  DI 23-1 at 101.

[6] The rest of the deposition largely pertained to Ms. Rivera's mental health treatment,
most of which she could not recall.  DI 23-1 at 109-115.

under the penalty of perjury. *Id.* at 4. Four exhibits are attached to the declaration. Exhibit A appears to be an email thread about Ms. Rivera attending a firearms training. *Id.* at 5-10. There is no indication on this document that Ms. Rivera successfully completed the course. *Id.* Exhibit B is a disorganized series of emails and text messages, as well as an excerpt from an OPR Report, apparently to "corroborate" that Ms. Rivera "prepared the CLD Investigative Reports . . . with the full knowledge of Messrs[,] Kanyuck[,] and Kamara." *Id.* at 11-26. Exhibit C reflects that other employees had to attend a writing class. *Id.* at 27-31. Finally, Exhibit D is a series of Investigative Reports that Ms. Rivera sent to her counsel. *Id.* at 32-43.

### III.    Summary Judgment Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

We view all evidence in the light most favorable to the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and then ask if "the evidence is such that a reasonable jury could return a verdict for the non-moving party," *Mervilus v. Union Cnty*, 73 F.4th 185, 193 (3d Cir. 2023) (quoting *Anderson*, 477 U.S. at 248). The non-movant must put forth "significant probative evidence tending to support the

9

complaint" and may not merely rely on its "allegations."  *Anderson*, 477 U.S. at 249.  If we find

that a reasonable jury, considering the evidence in the light most favorable to Ms. Rivera, could

not find the OAG liable, we must grant the OAG's motion for summary judgment.

### IV.    Analysis

Ms. Rivera alleges race and sex discrimination in violation of 42 U.S.C. § 1981, Title

VII of the Civil Rights Act, and the Pennsylvania Human Relations Act.  The OAG moved for

summary judgment on each of these claims.  Ms. Rivera opposes, largely based on the

declaration she filed in support of her opposition.  DI 29-4 at 9-10.  The OAG argues that her

declaration must be precluded as a sham affidavit.

We first analyze Ms. Rivera's declaration, discussed in detail below.  We find that it

does not create any genuine disputes of material facts, so we do not decide whether it should be

excluded as a sham affidavit.  Next, we address Ms. Rivera's Count II regarding Title VII and

Count III regarding PHRA claims.  We hold that the OAG is entitled to summary judgment on

Counts II and III because Ms. Rivera failed to put forth sufficient evidence of a hostile work

environment or unlawful termination.  Finally, we analyze Ms. Rivera's Count I, a claim under

§ 1981, and grant summary judgment because § 1981 does not have a private cause of action.

#### A.  Ms. Rivera's declaration of March 31, 2024 does not create any genuine disputes of material fact.

Ms. Rivera's declaration testimony differs significantly from her deposition testimony.

*Compare* 23-1 *with* DI 29-3 at 2-4.  The declaration states that Ms. Rivera "was stressed and

overwhelmed" in her deposition which impeded her ability to concentrate.  DI 29-3 ¶ 2.  The

declaration then includes number of statements on topics about which Ms. Rivera did not have

10

answers during her deposition, including that (i) she successfully completed her firearms remediation trainings, *id.* ¶ 3; (ii) she prepared investigate reports "with the full knowledge of Messrs[,] Kanyuck[,] and Kamara," presumably suggesting she did not forge their names, *id.* ¶ 4; and (iii) she prepared investigative reports according to the training she received, that other agents also had issues with report preparations, and that "there is no hard and fast rule concerning the format reports are required to follow," *id.* ¶ 5.

The OAG asks us to preclude Ms. Rivera's declaration as a sham.  In the Third Circuit, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."  *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 252 (3d Cir. 2007) (quotations omitted).  Ms. Rivera states that she "was stressed and overwhelmed" in her deposition, which impeded her ability to concentrate.  DI 29-3 ¶ 2.  It is not immediately clear that this means Ms. Rivera was "'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition."  *Jiminez*, 503 F.3d at 254.  And Ms. Rivera's opposition to summary judgment states "there is no evidence that [she] has an unusually fragile psyche."  DI 29-4 at 10.  Accordingly, we tend to agree with the OAG that this affidavit should be excluded — but first we closely evaluate the affidavit and each piece of evidence submitted with it to determine whether they, if accepted as true, would create any genuine disputes of material fact.

Exhibit A appears to be an email thread about a firearms training.  There is no indication on this document that Ms. Rivera successfully completed the course.  However, that Ms. Rivera was directed to take a firearms course or that she finished the required tasks during the course was not in dispute.  DI 23 ¶¶ 7-9; DI 29-2 ¶¶ 7-9; *see also* DI 23-4 at 4-5.  And the emails in Exhibit A reflect that the firearms course concluded on November 13, 2020.  DI 29-3 at 8.  The continued concerns with Ms. Rivera's firearm handling were expressed on November 20, 2020, *after* the course concluded, or to use Ms. Rivera's phrasing, *after* she "successfully completed" the course.  DI 23 ¶ 8; DI 29-3 ¶ 3; DI 23-4 at 1-2.  Therefore, Ms. Rivera's statements pertaining to her firearms deficiencies (including Exhibit A) do not create a genuine dispute of material fact.

Exhibit B is a disorganized series of emails, text messages, and an excerpt from an OPR Report to "corroborate" the conclusion that Ms. Rivera "prepared the CLD Investigative Reports . . . with the full knowledge of Messrs[,] Kanyuck[,] and Kamara."  DI 29-3 ¶ 4.  It is our understanding that the OAG's concern with the "CLD Investigative Reports" was that Ms. Rivera put other agents' names on the reports.  DI 23 ¶ 10.  At best, Exhibit B shows that Ms. Rivera did not intentionally forge the other agents' names, and it further underscores that she created reports with other agents' names on them, in violation of OAG policy.  Moreover, the OPR report, included in this exhibit, shows that the OAG was aware that Ms. Rivera was in communication with the other agents about drafting the reports on their behalf during the investigation.  DI 29-3 at 25.  Therefore, neither Ms. Rivera's statements about preparing reports with the knowledge or other officers nor Exhibit B create a genuine dispute of material fact.

Exhibit C reflects that other employees had to attend a writing class, which Ms. Rivera

uses to support her assertion that "I was not the only Agent who exhibited such issues [with report preparation]." DI 29-3 ¶ 5. But the fact that other employees had writing issues and attended a writing class is not seriously in dispute. DI 31 at 4.

Finally, Exhibit D is a series of Investigative Reports that Ms. Rivera sent to her counsel, which purportedly show that "there is no hard and fast rule concerning the format reports are required to follow." DI 29-3 ¶ 5. We did not understand the OAG to require that investigative reports follow a specific format. But more importantly, the criticism of Ms. Rivera's reporting was that her reports were "riddled with errors and unclear references." DI 23 ¶ 14. The suggestion that reports can be in any format, DI 29-3 ¶ 5, does not plausibly dispute the criticism that Ms. Rivera's reports were full of "errors and unclear references," DI 23 ¶ 14.

Because Ms. Rivera's affidavit and supporting evidence do not create any genuine disputes of material fact, we do not reach the question of whether the declaration should be excluded. We note, however, that Ms. Rivera's counsel could have raised any perceived issues with Ms. Rivera's state of mind to opposing counsel either at her deposition or in the two-month period between her deposition and when the declaration was filed, DI 31 at 2, or even sought relief from the court. But counsel did not — and indeed still fails to — make any credible argument as to why this last-minute affidavit should be given weight.[7]

---

[7] We would likely be justified in excluding Ms. Rivera's declaration. For nearly three hours, Ms. Rivera told opposing counsel that she did not recall her job requirements or performance, or the factual bases for her hostile work environment and discriminatory termination claims. Months later, faced with a summary judgment motion, she submitted an affidavit reflecting a much-improved memory.

An affiant must "explain the contradiction between a subsequent affidavit and a prior deposition." *Jiminez*, 503 F.3d at 254. Without this, a contradictory affidavit is *not* an

### B.  Title VII and PHRA

Ms. Rivera alleges violations of both Title VII of the Civil Rights Act and the

Pennsylvania Human Relations Act for race and sex discrimination.  Pennsylvania courts

"generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel Univ.*, 94

F.3d 102, 105 (3d Cir. 1996).  To the extent that a plaintiff's claims under Title VII and PHRA

are coextensive, we need not conduct a separate analysis for each of them.  *Id.*  Ms. Rivera's

claims indeed appear coextensive as they both are based on "defendant's discrimination and

retaliation," DI 7 at 8-9, so our analysis for Counts II and III is the same.

#### i.  Ms. Rivera failed to establish a hostile work environment.

A hostile work environment claim under Title VII or PHRA requires that a plaintiff

establish that (1) she suffered intentional discrimination because of her status in a protected

class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally

affected her; and (4) the discrimination would detrimentally affect a reasonable person in her

---

impediment to summary judgment.  *Id.*  Ms. Rivera states that she "was stressed and
overwhelmed" in her deposition, which impeded her ability to concentrate, DI 29-3 ¶ 2.  But her
opposition to summary judgment states "there is no evidence that [she] has an unusually fragile
psyche."  DI 29-4 at 10.

Depositions can be stressful and overwhelming, perhaps especially so in cases involving
claims of discrimination, and situations like this require a careful comparison of the deposition
transcript and arguably conflicting declaration.  Nonetheless, depositions deserve weight because
they have an important role in litigation that is not served by affidavits.  *Id.* at 253 ("[P]rior
depositions are more reliable than affidavits . . . since the deponent was either cross-examined by
opposing counsel, or at least available to opposing counsel for cross-examination . . . .
Affidavits, on the other hand, are usually drafted by counsel, whose familiarity with summary
judgment procedure may render an affidavit less credible.").  Moreover, this is not an instance in
which a deponent misspoke regarding one or two factual statements or was confused about a
question.  Ms. Rivera testified that she recalled nearly nothing pertaining to her own lawsuit for
nearly three hours, took no steps to address this deficiency, and then filed a contrary declaration
at the last hour.

position; and (5) there is a basis for *respondeat superior* liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Ms. Rivera cannot meet these requirements.

**1. Ms. Rivera has not advanced sufficient evidence showing that any discrimination was pervasive and regular.**

Ms. Rivera has not established that any discrimination she faced was sufficiently pervasive or severe to allow liability under Title VII or PHRA. To constitute severe or pervasive, the conduct at issue must create "an objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Indeed, a hostile work environment must "alter the conditions of [the victim's] employment." *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023). Occasional statements that "engender[] offensive feelings in an employee" are not sufficient to meet this standard. *Harris,* 510 U.S. at 21. We must consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Ms. Rivera alleged the following circumstances of a hostile workplace:

(1) Agent Martinez asking Agent Rucker whether she and Ms. Rivera were dating, which Agent Rucker reportedly told Ms. Rivera. DI 7 ¶ 13.
(2) Agent Martinez stating "look at Louie [Melendez] trying to fuck Beverly [Rivera]" to Agent Rucker, who reportedly told this to Ms. Rivera. *Id.*
(3) Agent Martinez purportedly preventing Ms. Rivera from working with other Narcotics Agents. *Id.* ¶ 15.
(4) Agent Martinez "blam[ing] Agent Rivera for poor performance by others," *Id.* ¶ 16.
(5) Agent Martinez using harsh language with Ms. Rivera in an "off the record" meeting about her performance. *Id.* ¶ 18. This included the phrasing, "You fucked up. And you have to admit when you fuck up. I am an old man and I admit when I fuck up." *Id.*

15

Record evidence supporting these allegations is scant.  Notably, Ms. Rivera did not recall the majority of these incidents in her deposition, and her declaration does not speak to them. Counsel merely points us to deposition testimony suggesting that Ms. Rivera talked to others at work about her difficulties with Agent Martinez.

In particular, counsel points out only (1) that Agent Lynch "testified that Ms. Rivera complained to him about [Agent] Martinez, and that she believed [Agent] Martinez had a problem with her," (2) that Agent Rucker "testified that each time she spoke with Ms. Rivera, Ms. Rivera complained about how [Agent] Martinez was treating her," and (3) that Officer Melendez "disagreed with [Agent] Martinez's assessment of Ms. Rivera's work on an investigation he was working with her, but [Agent] Martinez decided to reassign the investigation to another squad despite [Officer] Melendez vouching for Ms. Rivera's work."  DI 29-4 at 10-11.  Despite counsel's failure to appropriately reference or cite to any other evidence in the record, we accept Ms. Rivera's claim of discrimination to the OAG as potential corroborating evidence (because this is summary judgment) and consider whether it could forestall summary judgment.  DI 23-14.

 Even accepting the circumstances alleged by Ms. Rivera, they do not reach the high bar required for a hostile work environment claim.  The allegations were not physically threatening, did not unreasonably interfere with her work performance,[8] and were not sufficiently frequent.

---

[8] In her response to the OAG's summary judgment motion, Ms. Rivera's best argument for interference with her work performance is that Agent Martinez "reassign[ed] the investigation to another squad despite [Officer] Melendez vouching for Ms. Rivera's work."  DI 29-4 at 11.  However, she has adduced no evidence that this reassignment unreasonably interfered with her work performance, and she cannot rely on unsupported allegations to survive

16

In fact, Ms. Rivera continued to work as a Narcotics Agent until she was placed on administrative leave, without reporting any of the alleged discriminatory instances.  DI 24 at ¶¶ 34-36; DI 29-2 ¶¶ 34-36.  That Ms. Rivera's allegations may be corroborated by others does not make the severity or pervasiveness of the alleged conduct sufficient to establish a hostile work environment.

The Third Circuit has affirmed summary judgment for an employer in instances with similar or more egregious facts.  For example, in *Nitkin v. Main Line Health*, the Third Circuit affirmed a finding of no hostile work environment despite seven instances where a supervisor made sexually inappropriate comments to an employee.  67 F.4th at 567-73.  At one point, the conduct led the employee to lock herself in an office bathroom out of fear for her personal safety, but the Third Circuit said that was not sufficient to establish a hostile work environment because the supervisor "never propositioned [plaintiff] for a date or sex, never touched her, and never directed sexually inappropriate comments specifically at her."  *Id.* at 569, 572.  Similarly, here Ms. Rivera does not allege that Agent Martinez propositioned her, touched her, or directed comments about race or sex specifically at her.  DI 7 ¶¶ 13-18.  The situation alleged by Ms. Rivera, and the evidence she has put forth in support of her allegations, show less pervasive and severe conduct than what was insufficient in *Nitkin*.

And in *Ali v. Woodbridge Township School District*, the Third Circuit affirmed a finding of no hostile work environment when a supervisor greeted an employee with offensive, racially insensitive remarks, noting that the remarks were not "as severe as the use of an unambiguous

---

summary judgment.

racial epithet." 957 F.3d 174, 182 (3d Cir. 2020). And the remarks were not "so pervasive that they altered the working environment," even when made during meetings that occurred immediately prior to the employee's termination. *Id.* at 179, 182. Here, Agent Martinez's alleged remarks included harsh and vulgar language, DI 7 ¶¶ 13-18, but, like in *Ali*, were not "as severe as the use of an unambiguous racial epithet." 957 F.3d at 182. That some remarks were purportedly made in a meeting about Ms. Rivera's job performance prior to her termination, DI 7 ¶ 18, does not alone make the comments "so pervasive that they altered the working environment" according to *Ali*, 957 F.3d at 179-82.

Both *Nitkin* and *Ali* involved a supervisor making more explicit and frequent statements regarding a plaintiff's sex and race than what Agent Martinez is alleged to have done here. Yet the conduct in *Nitkin* and *Ali* was not severe or pervasive under the law. Accordingly, Ms. Rivera allegations and adduced evidence fail to meet the severe and pervasive standard necessary to take a hostile work environment claim to a jury.

### 2. Ms. Rivera failed to put forth evidence demonstrating *respondeat superior* liability.

Ms. Rivera has failed to establish "the existence of *respondeat superior* liability." *Huston*, 568 F.3d at 104. "An employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). Tangible employment actions are "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* And they typically involve "changes to pay, benefits, or

18

employment status." *Reynolds v. Dep't of the Army*, 439 Fed. Appx. 150, 153 (3d Cir. 2011). If a purported supervisor is not empowered to take tangible employment actions against the plaintiff, that employee is merely a co-worker, even if they are colloquially referred to as a supervisor. *Vance,* 570 U.S. at 431-32.

Here, it is disputed whether Agent Martinez constituted Ms. Rivera's supervisor under Title VII and PHRA. The OAG argues that Agent Martinez was not Ms. Rivera's supervisor because he "did not hire or fire [her], nor was he responsible or tasked with hiring or firing [her]." DI 24 at 12. We agree that Agent Martinez did not have authority to fire Ms. Rivera, though the decision-making structure at the OAG is not particularly clear. Of note, Assistant Deputy Chief Nehemiah Haigler ("Chief Haigler"), who supervised Agent Martinez, testified that the decision to terminate Ms. Rivera was "way above his paygrade." DI 23-7 at 64-65.

However, the evidence suggests Agent Martinez may have had relevant supervisory authority, even though it did not encompass the power to hire or fire. Most notably, Agent Martinez prepared Ms. Rivera's performance reviews, DI 23-6 at 47, and testified that he had authority to extend a narcotics agent's probation term, *id.* at 64-65. Moreover, Chief Haigler testified that Agent Martinez was Ms. Rivera's supervisor and that he was treated as such. DI 23-7 at 38. And OAG counsel asked Ms. Rivera "who became your supervisor after [Chief] Haigler," to which Ms. Rivera responded, "John E. Martinez," and Ms. Rivera confirmed that his title was "supervisor of the strategic response team." DI 23-1 at 38. Finally, in its own statement of undisputed facts, the OAG refers to Agent Martinez as Ms. Rivera's "direct supervisor" and as "Supervisor Martinez." DI 23 ¶¶ 24, 34, 37(a)(iii), 37(b).

We recognize that being "colloquially referred to as a supervisor" is not enough to make

19

someone a supervisor under Title VII and PHRA. *Vance,* 570 U.S. at 431-32. But given Agent Martinez's power to extend Ms. Rivera's probationary period, his responsibility for her performance reviews, his ability to determine her project assignments, and defense counsel's recognition of him as Ms. Rivera's supervisor, a reasonable juror could conclude that he constituted Ms. Rivera's supervisor for the purposes of Title VII and PHRA. Therefore, we treat him as such for the purpose of this analysis.

If a supervisor's harassment "culminates in a tangible employment action, the employer is strictly liable." *Id.* at 424. Ms. Rivera has pointed to no evidence demonstrating that Agent Martinez's harassment *culminated* in a tangible employment action. First, it is undisputed that the decision to terminate Ms. Rivera was made by someone other than Agent Martinez — someone "way above [the] paygrade" of even Agent Martinez's supervisor, Chief Haigler. DI 23-7 at 64-65. And it was Chief Haigler who raised Ms. Rivera's performance issues to OPR, and OPR placed Ms. Rivera on administrative leave. DI 23 ¶¶ 21-23; DI 29-2 ¶¶ 21-23. Accordingly, the only possible "tangible employment action" made by Agent Martinez was his purported reassignment of Ms. Rivera from an investigation that she was working on with Officer Melendez. DI 29-4 at 11. The only evidence in the record on this point is that Agent Martinez made the reassignment because Officer Melendez "was moving too fast and [Ms. Rivera] couldn't keep up." DI 23-15 at 21. But what's missing is any evidence that Agent Martinez's moving her to a slower moving investigation significantly changed her responsibilities or status, or that it changed her pay or benefits. *Vance*, 570 U.S. at 431. Because unsupported allegations do not constitute evidence, no reasonable juror could find that Agent Martinez's alleged conduct resulted in a tangible employment action.

If a supervisor's conduct does not culminate in a tangible employment action, "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* at 424.  It is undisputed that the OAG made this showing.

First, the OAG adduced evidence of its policy prohibiting discrimination and harassment and reporting procedures for alleged discrimination or harassment.  DI 23 ¶ 42.  The policy directed employees report discrimination or harassment to a Division Director and to the Director of Human Resources, which would lead to an investigation.  *Id.* ¶¶ 43-44.  None of this was disputed by Ms. Rivera.  DI 29-2 ¶¶ 42-44.  Ms. Rivera acknowledged receipt of this OAG policy in 2019, 2020, and 2021.  DI 23-19.  In light of this and considering that Ms. Rivera has adduced no evidence tending to show that OAG failed to exercise reasonable care to prevent and correct any harassing behavior, the OAG satisfied the first prong required by *Vance*.  570 U.S. at 424.

Second, it is undisputed that Ms. Rivera did not "take advantage of the reporting policies . . . during her employment with OAG as a Narcotics Agent."  DI 23 ¶¶ 46-47; DI 29-2 ¶¶ 46-47.  Ms. Rivera adduced no evidence suggesting that her failure to report was reasonable, and the record evidence suggests otherwise.  There is testimony that several of Ms. Rivera's colleagues urged her to escalate her concerns with Agent Martinez, DI 23-16 at 12; DI 23-17 at 13-14, and it is undisputed that she failed to do so, DI 23 ¶¶ 46-47; DI 29-2 ¶¶ 46-47.  Therefore, OAG has satisfied the second prong required by *Vance*, 570 U.S. at 424, and it may not be held liable under *respondeat superior* for harassment by Agent Martinez, even if a jury found him to

constitute a supervisor for the purposes of Title VII and PHRA.

### ii. Termination

Ms. Rivera concedes that there is no direct evidence of discrimination.  DI 29-4 at 5.

Therefore, we evaluate her claim of discriminatory termination under the *McDonnell Douglas*

framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell*

*Douglas*, Ms. Rivera bears the initial burden of demonstrating a prima facie case of unlawful

discrimination.  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).

Once she has done that, the OAG must articulate a legitimate, nondiscriminatory reason for its

decision to terminate her.  *Id.*

To prevail on her claims of discrimination, Ms. Rivera must "point to some evidence"

that the OAG's articulated reason for her termination is pretextual.  *Id.* (quoting *Fuentes v.*

*Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  She may do that by submitting evidence which "(1)

casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a

factfinder could reasonably conclude that each reason was a fabrication; or (2) allow(s) the

factfinder to infer that discrimination was more likely than not a motivating or determinative

cause of the adverse employment action."  *Fuentes*, 32 F.3d at 762.  Ms. Rivera must do more

than demonstrate that the OAG made a wrong or mistaken decision, but instead must

demonstrate the pretextual nature of the OAG's decision, such as by showing "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions" in the OAG's explanation.  *Id.*

at 765.

Ms. Rivera has not shown that a reasonable juror could find that the OAG's purported

reasons for termination were pretextual.  In response to the OAG's motion for summary

judgment, Ms. Rivera argues that her claims should not be dismissed because "[f]irst, she is a Puerto Rican female.  Second, she was qualified to perform the duties of a Narcotics Agent I, her position at the time of her termination.  Third, she was terminated.  Fourth, the circumstances surrounding her termination give rise to an inference of both race and sex discrimination.  The same evidence . . . also demonstrates the defendant's alleged legitimate, non-discriminatory reason for Ms. Rivera's termination, is pretextual."  DI 29-4 at 7.  These arguments might carry weight at the motion to dismiss stage.  But at summary judgment, the plaintiff must point to *evidence* "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Ms. Rivera needed to identify evidence that "discrimination was more likely than not a motivating or determinative cause of" her termination.  *Fuentes*, 32 F.3d at 762.  She did not do so.

Ms. Rivera's poor work performance was well documented.  DI 23 at 3-8.  For example, the OAG put forth the following: (1) a negative performance evaluation detailing Ms. Rivera's problematic performance in a number of areas, *id.* ¶¶ 4-5; (2) evidence of Ms. Rivera issues with firearm handling, *id.* ¶¶ 5-6; (3) evidence of Ms. Rivera's issues with reporting, *id.* ¶¶ 5-7; and (4) memorialization of problems with Ms. Rivera's undercover work, *id.* ¶ 18.

Ms. Rivera does not dispute the written record.  DI 29-2 ¶¶ 4-33.  Instead, she disputes the OAG's assessment of her performance.  For example, "[i]t is admitted that Ms. Rivera's supervisor prepared an Annual Performance Evaluation for her for the period August 2020 through August 2021.  The Annual Performance Evaluation is a written document, which speaks for itself.  It is denied that Ms. Rivera's work performance was problematic."  *Id.* ¶ 4.  But "[t]he fact that an employee disagrees with an employer's evaluation of [her] does not prove pretext."

*Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991).  An employer may win summary

judgment — despite an "employee's assertions of [her] own good performance" — when "the

employer produced performance reviews and other documentary evidence of misconduct and

insubordination that demonstrated poor performance." *Sempier v. Johnson & Higgins*, 45 F.3d

724, 731 (3d Cir. 1995).  The OAG has done that here.

Interpreting Ms. Rivera's opposition to summary judgment as broadly as possible, she

makes two other arguments for pretext.  First, she asserts that "her fellow Investigators with

OAG and her prior supervisors at the Liquor Control Board touted [her] vast experience, and

good work, in undercover investigations."  DI 29-4 at 9.  Based on this, and again interpreting

her argument generously, Ms. Rivera suggests that a reasonable jury could believe the OAG's

explanation of her termination to be dishonest or otherwise not worthy of credence.  *Id.* at 5-11.

However, the only arguably relevant evidence that other employees approved of Ms. Rivera's

work is Officer Melendez's deposition — cited for a different reason — in which he claimed to

have disagreed with Agent Martinez's negative assessment of Ms. Rivera.  *Id.* at 11.[9]  But

Officer Melendez did not supervise Ms. Rivera.  DI 23-15 at 27-28.  And what matters for

pretext is "the perception of the decision maker," *Billet*, 940 F.2d at 825, which Officer

Melendez was not.  Therefore, Officer Melendez's views cannot be the basis for finding pretext.

Moreover, "[t]he attempt to use past positive performance reviews to show that more recent

criticism was pretextual fails as a matter of law." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474

(2005).  Therefore, Ms. Rivera's proposition that she was known to be a good undercover

---

[9] The other deposition testimony cited was to corroborate Ms. Rivera's allegations of
mistreatment, not her work quality.  DI 29-4 at 11.

investigator in her past job does not raise a genuine dispute of material fact.

Second, Ms. Rivera argues that she was terminated only due to her "poor report-writing skills" and states "the evidence is at least in dispute concerning whether Ms. Rivera's report-writing skills were equivalent to those of Messrs, Lynch, Schurr, and Kamara, all male and non-Hispanic, who also were assigned to a remedial report-writing class, but who were not disciplined in connection with their report-writing." DI 29-4 at 9. Based on this, Ms. Rivera argues that the OAG treated similar employees differently. Interpreting that argument broadly, Ms. Rivera may be suggesting that the OAG's nondiscriminatory reasons for termination have "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that "a reasonable fact finder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765. We disagree.

Chief Haigler testified that an agent being directed to attend a writing class is not necessarily an indication that they are deficient. DI 23-7 at 55-58. That multiple employees were directed to attend a writing class does not mean that they all had the same level of deficiencies, or even deficiencies at all. And the OAG has advanced evidence of Ms. Rivera's unique writing deficiencies, including that her reports were "riddled with errors and unclear references," DI 23 ¶¶ 10-14, and that her significant report-writing issues were materially worse than other officers' report-writing issues, DI 31 at 4-5. Most notably, Ms. Rivera had been reprimanded for creating reports with other agents' names on them. DI 23 ¶¶ 10, 12. The OAG showed that "no other employee that Supervisor Haigler could recall, in his 16 years with OAG, had ever forged another agent's name on a report given to a Deputy Attorney General for a criminal investigation." DI 31 at 4.

25

Ms. Rivera did not dispute that she "authored two discoverable reports identifying the authors of the reports as Ryan Kanyuck and Sidiqi Kamara," but argues that she did so with the full knowledge of the other agents.  DI 29-2 ¶¶ 10, 12;  DI 29-3 ¶ 4.  But as discussed, Exhibit B at best shows that Ms. Rivera did not intentionally forge the other agents' names.  It does not dispute that she created reports with other agents' names on them.  Thus, there can be no dispute that there was a unique problem with Ms. Rivera's report writing being out of compliance with OAG policy.  DI 23-6 at 32-33.  Given this context, Ms. Rivera has not adduced evidence that her conduct was sufficiently similar to that of other officers that were not terminated, such that a reasonable juror could infer discrimination from the OAG treating similarly situated employees differently.

Furthermore, what matters for the purpose of assessing whether Ms. Rivera's termination was discriminatory is what was in the mind of the decision-maker.  *See Fuentes*, 32 F.3d at 766-67 ("the question is whether [the decisionmaker] believed those criticisms to be accurate and actually relied upon them, since only if [plaintiff] can ultimately prove that [the decisionmaker] in fact did *not* rely upon them can [plaintiff] show 'pretext'") (emphasis added).  The decision-maker making "a wrong or mistaken decision" is not enough for liability — discrimination must have been more likely than not a motivating or determinative cause of her termination.  *Id.* at 762-65.  At worst, the decision-maker here relied on incomplete information about Ms. Rivera's reporting and made a "wrong or mistaken decision."  *Id.* at 765.  But that is not discrimination, and it is not our role to correct "a wrong or mistaken decision" that is not discriminatory.  *Id.* at 765.

Finally, while Ms. Rivera's uniquely poor report-writing skills were a factor in her

termination, the OAG provides a long list of other evidence demonstrating her poor work performance that also factored into the termination decision.  This included Ms. Rivera's negative performance evaluation, issues with her firearm handling, and problems with her undercover work.  *See generally* DI 23 at 3-10; DI 23-2; 23-5; DI 23-10.  No reasonable juror could consider all of the above documentary evidence from the OAG — the legitimacy of which Ms. Rivera did not seriously challenge — and find that the OAG's purportedly non-discriminatory reasons for terminating Ms. Rivera were pretextual.  Therefore, we must grant the OAG's motion for summary judgment.

### C.  Count I is foreclosed as a matter of law because there is no private cause of action under 42 U.S.C. § 1981.

Under Third Circuit precedent, 42 U.S.C. § 1981 does not provide a private right of action.  Instead, "the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units" is the "the express cause of action for damages created by § 1983." *McGovern v. City of Philadelphia*, 554 F.3d 114, 120-21 (3d Cir. 2009).

Ms. Rivera did not plead any claim under § 1983, so her § 1981 claim must be dismissed under *McGovern*.  554 F.3d at 120-21.  The OAG's motion for summary judgment raised this argument, DI 24 at 8-9, and plaintiff did not respond to it.  Accordingly, we dismiss Ms. Rivera's Count I under § 1981.[10]

---

[10] Even if Ms. Rivera had pled a claim under § 1983 against the OAG, it would have failed as a matter of law.  First, the Eleventh Amendment bars such suit unless the state has waived immunity or Congress has overridden it.  *Welch v. Texas Dep't of Highways and Public Transp.*, 483 U.S. 468, 472-73 (1987).  Pennsylvania has withheld its consent to suit in federal court.  42 Pa. Cons. Stat. § 8521(b); *Downey v. Pa. Dep't. of Corr.*, 968 F.3d 299, 309-310 (3d Cir. 2020).  And Congress has not abrogated the states' immunity from §1983 actions.  *Quern v. Jordan*, 440 U.S. 332, 345 (1979) ("§ 1983 does not explicitly and by clear language indicate on

**V.        Conclusion**

For the reasons stated above, the OAG's motion for summary judgment is granted in full. Ms. Rivera failed to adduce evidence sufficient for a reasonable jury to find OAG liable for a hostile work environment or unlawful termination under Title VII or the PHRA, and 42 U.S.C. § 1981 does not provide a private right of action under which Ms. Rivera could obtain relief. The record does not establish the existence of a hostile work environment or that the OAG's performance-related reasons for terminating Ms. Rivera constitute pretext.  Ms. Rivera's late-filed declaration in support of her opposition to summary judgment, even when taken as true, does not raise any genuine disputes of material fact as to either of these claims.  Therefore, we must grant the OAG's motion for summary judgment.

---

its face an intent to sweep away the immunity of the States"). Therefore, the Commonwealth of Pennsylvania is immune from suit under § 1983.

Second, "neither a State nor its officials acting in their official capacities are 'persons' under §1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). This includes state agencies. *See e.g.*, *Warren v. Pennsylvania Department of Corrections*, 616 A.2d 140, 142 (Pa. Commw. Ct. 1992).  Because defendant is "the Commonwealth of Pennsylvania, Office of Attorney General" — an agency of the Commonwealth of Pennsylvania, DI 7 ¶ 5 — any potential § 1983 claim would fail.